FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2008 NOV 20  P 2: 05

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

| | |
|---|---|
| JON FINKELSTEIN<br>43601 Edison Club Court<br>Ashburn, VA 20147<br><br>    Plaintiff,<br><br>    V.<br><br>SLM HOLDINGS, INC.<br><br>Serve:<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801<br><br>    Defendant. | Civil Action No. _1:08cv1211_<br>_LO/IDD_ |

## COMPLAINT

Plaintiff Jon Finkelstein ("Finkelstein"), by counsel, hereby states the following in support of his Complaint against the defendant SLM Holdings, Inc. ("SLM"):

1.  Finkelstein is a Virginia resident who has worked for SLM for the past year.

2.  SLM is a Delaware corporation with its principal place of business in the State of New York.  It has transacted substantial business in Virginia.

3.  Jurisdiction is appropriate pursuant to 28 U.S.C. § 1332 and venue is appropriate pursuant to 28 U.S.C. § 1391.

### Sale of Business

4.  Finkelstein is an owner of Vertical Falls, LLC ("Vertical Falls"), a Virginia corporation based in Fairfax County which specializes in financial software solutions.

5.  On August 10, 2007, Vertical Falls and SLM entered an asset purchase agreement ("Asset Purchase Agreement") in which Vertical Falls sold various of its assets to SLM.  A copy of the Asset Purchase Agreement is attached as Exhibit A.

6.  As part of the Asset Purchase Agreement, SLM agreed to undertake certain obligations to Finkelstein, as an owner of Vertical Falls.  Among those was the assumption of Finkelstein's obligations under a $300,000.00 line of credit ("Line of Credit") with Mercantile Potomac Bank, now PNC Bank.

7.  In addition, Finkelstein and SLM entered an Employment Agreement ("Employment Agreement") on August 10, 2007.  A copy of the Employment Agreement is attached as Exhibit B.

8.  Under the terms of the Employment Agreement, SLM agreed to employ Finkelstein for three (3) years at a rate of $200,000 per year.  The Employment Agreement also entitled Finkelstein to a one-time bonus of $100,000.00, as well as health insurance up to $1,000.00 per month.

9.  Finkelstein has been working for SLM continuously from August 10, 2007 until the present.  At all times, he has been in compliance with the terms of the Employment Agreement and Asset Purchase Agreement.

10.  To date, SLM has only paid Finkelstein a sum total of $70,000.00 for his services under the Employment Agreement.

11.  On November 10, 2008, SLM gave notice to Finkelstein that he was being terminated.  Although the termination stated that it was "for cause," it failed to give any reason.  Furthermore, it failed to give proper notice as required by the Employment Agreement.

12.    Notwithstanding its ineffective termination, SLM is in breach of the Employment Agreement for failing to pay Finkelstein the following promised items: (i) the annual compensation through November 2008, (ii) the health benefits through November 2008 and (iii) the $100,000 bonus.  Those amounts aggregated together equal a total of not less than $317,166.67.

13.    In addition, SLM is in breach of the Asset Purchase Agreement for failing to either pay the interest on the Line of Credit or refinancing the Line of Credit in order to release Finkelstein as a guarantor.  As a result of its failure, Finkelstein is personally liable for the default.

## COUNT ONE – BREACH OF EMPLOYMENT AGREEMENT

14.    Finkelstein hereby incorporates the allegations in paragraphs 1-13.

15.    Finkelstein has at all times complied with the terms of the Employment Agreement.

16.    SLM has breached the Employment Agreement by failing to pay monies due and owing to Finkelstein under its terms.  Finkelstein has been proximately harmed by this breach of contract.

WHEREFORE, Finkelstein seeks compensatory damages in the amount of $317, 166.67, plus his costs, attorney's fees and prejudgment interest from the date of the breach.

## COUNT TWO – BREACH OF ASSET PURCHASE AGREEMENT

17.    Finkelstein hereby incorporates the allegations in paragraphs 1-16.

18.    Finkelstein has at all times complied with the terms of the Asset Purchase

Agreement.

19.    SLM has breached the Asset Purchase Agreement by failing to pay the interest on the Line of Credit and causing it to go into default. Finkelstein has been proximately harmed by this breach.

      WHEREFORE, Finkelstein seeks compensatory damages in the amount of $300,000.00, plus his costs, attorney's fees and prejudgment interest from the date of the breach.

TRIAL BY JURY IS HEREBY DEMANDED

SUROVELL MARKLE ISAACS & LEVY PLC

J. Chapman Petersen, VSB #37225
Jonathan Dailey, VSB #37442
4010 University Drive, 2nd floor
Fairfax, VA 22030
(703) 251-5400 (ph)
(703) 591-9285 (fax)
jpetersen@smillaw.com
Counsel for Jon Finklestein

# EXHIBIT  A

## ASSET PURCHASE AGREEMENT

THIS AGREEMENT, dated as of the 10th day of August, 2007, is between SLM Holdings, Inc., a Corporation organized and existing under the laws of the State of Delaware (the "Company" or the "Buyer"), and VerticalFalls Software, Inc., a corporation organized and existing under the laws of the State of Virginia (the "Seller" and together with the Buyer, the "Parties").

## RECITALS:

WHEREAS, Seller owns the right to use the name "VerticalFalls Software, Inc." and all copyrights, trademarks and trade names related thereto, as well as all the assets, bank accounts, intellectual properties, receivables and current and fixed assets enumerated and described in Exhibit A attached hereto (the "Assets"); and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from the Seller, all of Sellers' right, title and interests in and to the Assets.

NOW, THEREFORE, in consideration of the mutual covenants herein and intending to be legally bound hereby, the Parties agree as follows:

## SECTION 1.   PURCHASE AND SALE

1.01 Purchase and Sale of Assets. At Closing, and subject to the terms and conditions set forth herein, Seller shall sell, transfer, convey, assign, grant, convey and deliver to Buyer, and Buyer shall purchase and acquire (i) the name and the right to use the name "VerticalFalls Software, Inc." and all copyrights, trademarks and trade names related thereto; and (ii) all the Assets of the Seller enumerated in Exhibit A.  Seller covenants that it will not use the name "VerticalFalls Software, Inc." to market to or solicit potential or existing customers or employees of the Seller or Buyer. The Assets to be purchased and acquired shall be free and clear of all liens, mortgages, pledges, security interests, charges, claims, restrictions, and encumbrances created by, through or under Seller, except for those enumerated in Schedule 1.01. The consideration to be paid herein shall be allocated among the Assets as indicated in Exhibit A-1.

1.02 Method of Conveyance.  The sale, transfer, conveyance assignment and delivery by Seller of the Assets to the Buyer shall be effected by Seller's execution and delivery of an Assignment of the Assets substantially in the form of Exhibit B attached hereto (the "Assignment").

## SECTION 2.   CONSIDERATION; CLOSING

2.01 Consideration. The consideration (the "Consideration") (as allocated in Exhibit C) for the Assets to be sold, transferred and conveyed by Seller to Buyer pursuant to this Agreement shall be:

(i)        The assumption by the Company of the Seller's trade debt of $150,000 ("VF Trade Debt") as listed in Schedule 2.01;

(ii)       The assumption by the Buyer of the Seller's credit line with Mercantile Potomac Bank in the maximum amount of $300,000 (the "VF Credit Line"), and payment of any interest accrued thereon after the Closing date, which shall be paid monthly by the Buyer (the "VF Credit Line" and together with the "VF Trade Debt," the "VF Debts"); provided that the assumption by

1



the Buyer of the VF Credit Line will not require any of Buyer's executive officers to personally guarantee the payment thereof. .

      (iii)     The assumption by the Buyer of the Seller's obligation to National Capital Companies, LLC ("NCC") entered into by the Seller with NCC herein on August 10, 2007, which all parties to this Agreement have agreed to be payable as follows:

             a.)     A note bearing 8% interest in the amount of $80,000 (the "Note"), payable in full on the earlier of (1) the Buyer's receipt of aggregate net proceeds from a private or public offering of its securities amounting to at least $700,000; or (2) after 120 days upon the execution of this Agreement.

             In the event that gross proceeds are received from a private offering of the Buyer's securities in excess of $300,000, the Note shall be paid at a rate of $0.20 for every dollar received above $300,000.

             $25,000 of the Note is personally guaranteed, jointly and severally, by Jon Finkelstein and Neil Kleinberg.

             b.)     A right to receive $0.50 for every dollar collected by the Buyer from all the royalties collected and received from Sage, up to a maximum of $70,000.

             c.)     500,000 shares of the Buyer's common stock on the same terms and conditions as the Shares, as defined below.

The assumption by the Buyer of the obligation to NCC in accordance with the terms of this Agreement supersedes any previous agreement between NCC and Seller.

      (iv)     The Buyer shall also issue and deliver to the Seller's Chief Executive Officer, Jon Finkelstein, [2,612,500] shares of the Buyer's common stock and to the Seller's President, Neil Kleinberg, [2,137,500] shares of the Buyer's common stock (the shares of the Buyer's common stock to be transferred to each of Mr. Finkelstein and Mr. Kleinberg shall hereinafter be referred to as the "Shares").

It is the intent and agreement of the parties herein that the Shares delivered as part of the consideration herein shall at all points in time have the same rights, privileges, and preferences as the shares that may be held from time to time by Jason Bishara. To the extent any change occurs in the rights, privileges, and preferences of the common stock currently held by Jason Bishara, the same changes will be reflected in the interests granted to the Seller pursuant to this agreement.

      2.02 <u>Payment of Consideration</u>. On the Closing Date (as defined below), Buyer shall pay the Consideration through the issuance and delivery of certificates representing the Shares, as well as by delivering to NCC the Note and shares of common stock required under Section 2.01 (iii) above.

      2.04     <u>The Closing</u>. The closing (the "Closing") of the transactions defined by this Agreement will take place on or before August 10, 2007 (the "Closing Date"), at the offices of Gersten Savage LLP at 600 Lexington Ave., 9th Floor, New York, New York 10022 or on such other date or at such other time and place as the Parties may hereafter agree in writing. The parties may also elect to effect the Closing by transmittal of documents by courier, email and/or facsimile and the agreed execution of said documents. Time is of the essence in Closing

2.05    Acts Subsequent to Closing. On the Closing Date, the Buyer shall enter into a three year employment agreement with Jon Finkelstein ("Finkelstein") under which Finkelstein shall commit to serve as an Executive Officer of the Buyer, as well as to serve as a member of the Board of Directors thereof. The terms of Finkelstein's employment by the Buyer will be governed by the employment agreement to be entered into by and between the Buyer and Finkelstein of even date herewith.

## SECTION 3.   REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Buyer, as of the date hereof and as of the Closing Date, in addition to all the other representations and warranties of Seller contained herein, that:

3.01    Ownership of Assets. Seller represents that it is the sole owner of the Assets, free and clear of any liens, mortgages, pledges, security interests, charges, claims, restrictions and encumbrances, except as set forth in Schedule 1.01 hereof, as well as of the name VerticalFalls Software, Inc. and all copyrights, trademarks and trade names related thereto.

3.02    Ownership of Trade Name. To the best of Seller's knowledge and belief, the Seller has obtained all rights to use, and is the sole legal owner of the trade name "VerticalFalls Software, Inc." and all trademarks related thereto.

3.03    Payment of Royalties. Seller represents that all royalty payments owed and payable to the Seller under any agreements to which it is a party or third party beneficiary are current and have been paid on a timely basis without need of demand for payment made by the Seller.

3.04    Number of Users.        Regarding FAct licenses and active customers utilizing its software and products (per Exhibit A Customer/Prospect Lists), the Seller represents to the Buyer the following:

Based on VF records, information provided to Seller by Sage Software and information provided to Seller by its customers, there are currently 8207 active Fact users; and an additional 4595 copies of Fact software that have been delivered to clients.

3.05    Corporate Organization, Etc. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Virginia having all requisite power and authority to carry on its business and to own, lease and operate its properties and assets including the Assets.

3.06 Authorization, Etc. Seller has all requisite power and authority to execute, deliver and perform its obligations under the Agreement. Seller has taken all corporate action required by law or otherwise to be taken to authorize Seller's execution and delivery of this Agreement and Seller's consummation of the transactions contemplated hereby. This Agreement is valid and binding upon Seller and is enforceable in accordance with its terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to the enforcement of creditors' rights.

3.07    No Violation. Neither the execution and delivery of this Agreement by Seller nor the consummation of the transactions contemplated hereby by Seller will violate any provisions of the Articles or Certificate of Incorporation or By-Laws of the Seller, or with or without notice, lapse of time or both, would constitute a default under, or result in the termination or invalidity

3

of, or accelerate the performance required by, or cause the acceleration of the maturity of any debt or obligation pursuant to, any agreement or commitment to which Seller is a party or by which Seller is bound, or violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority.

3.08 <u>Investment Purpose.</u> The Seller's Chief Executive Officer and President represents that it is acquiring the Shares solely for its own account, for investment purposes, and not with a view to the distribution or resale of such Interests.

3.09    The Seller also undertakes and warrants that it, for a period of 5 years, its principals, officers and directors will not solicit or pursue any form of professional relationship with any and all of the Seller's former or prospective customers or with any present or prospective customers of the Company.

## SECTION 4. REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents and warrants to the Seller, as of the date hereof and as of the Closing Date, in addition to all the other representations and warranties of Buyer contained herein, that:

4.01 <u>Corporate Organization, Etc.</u> Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware having all requisite power and authority to carry on its business and to own, lease and operate its properties and assets including the Assets.

4.02 <u>Authorization, Etc.</u> Buyer has all requisite power and authority to execute, deliver and perform its obligations under the Agreement.  Buyer has taken all corporate action required by law or otherwise to be taken to authorize Buyer's execution and delivery of this Agreement and Buyer's consummation of the transactions contemplated hereby.  This Agreement is valid and binding upon Buyer and enforceable in accordance with its terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to the enforcement of creditors' rights.

4.03 <u>No Violation.</u> Neither the execution and delivery of this Agreement by Buyer nor the consummation of the transactions contemplated hereby by Buyer will violate any provisions of the Articles or Certificate of Incorporation or By-Laws of the Buyer, or with or without notice, lapse of time or both, would constitute a default under, or result in the termination or invalidity of, or accelerate the performance required by, or cause the acceleration of the maturity of any debt or obligation pursuant to, any agreement or commitment to which Buyer is a party or by which Buyer is bound, or violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority.

4.04 <u>Validity of Shares.</u> The Shares issued to the Seller as part of the consideration for this Agreement shall be duly authorized, validly issued and  fully paid and non-assessable and shall, as of the Closing Date, represent approximately 10.9% of the authorized and outstanding shares of the capital stock of the Company.

## SECTION 5. CERTAIN COVENANTS AND AGREEMNTS

5.01 <u>Consummation of Transactions.</u> Each of the Parties agrees to use its best efforts to take or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the

4

transactions contemplated by this Agreement as expeditiously as practicable. In case at any time after the date hereof any further action is necessary or desirable to carry out the purposes of this Agreement, the appropriate party will take all such necessary action, including without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other party or parties for such purposes or otherwise to complete or perfect the transactions contemplated hereby.

5.02   Release of Personal Guarantee.   Upon Buyer's receipt, at any time after the execution of this Agreement, of aggregate net proceeds from private or public offerings of its securities amounting to at least $5,000,000 cumulatively , the Buyer hereby agrees to obtain the release of the personal guarantees given by Jon Finkelstein and Neil Kleinberg in relation to the VF Credit Line.

## SECTION 6. DELIVERIES BY BUYER

6.01 Officers' Certificates. At Closing, Buyer shall furnish the Seller with certificates dated the Closing Date (i) confirming Buyer's performance of and compliance with all agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date, (ii) confirming that the representations and warranties of Buyer contained in this Agreement are true, complete and accurate in all respects, and (iii) confirming the due execution of the employment agreement between Buyer and Finkelstein.

6.02 Additional Documents. At Closing Buyer shall deliver to Seller the Instruments of Conveyance and the Certificates representing the Shares for the purpose of effecting the transactions provided for and contemplated by this Agreement.

## SECTION 7. DELIVERIES BY SELLER

7.01 Officers' Certificates. At Closing, Seller shall furnish the Buyer with certificates dated the Closing Date (i) confirming Seller's performance of and compliance with all agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and (ii) confirming that the representations and warranties of the Seller contained in this Agreement are true, complete and accurate in all respects.

7.02   Assignment Documents. At Closing, Seller shall deliver to Buyer the Assignment for the Assets and all other transfer documents reasonably requested by Buyer's counsel to effectuate the transaction.

## SECTION 8. REGISTRATION RIGHTS

(a)   Piggy-Back Rights.

(i)   If at any time following an initial public offering of the Company's securities the Company proposes to register its securities under the Securities Act of 1933, as amended (the "Securities Act") for sale to the public (including shelf registration on Form S-3), whether for its own account or for the account of other security holders for sale to the public (except for registrations pursuant to registration statements on Form S-8, S-4 or another form not available for registering the), the Company shall give written notice to the Seller of such proposed registration at least twenty (20) days prior to the filing of a registration statement. Upon the written request of the Seller, given within ten (10) days after receipt of any such notice, to register any of the Conversion Shares ("Eligible Securities"), the Company will use reasonable

efforts to cause the Eligible Securities as to which registration shall have been so requested to be covered by the registration statements proposed to be filed by the Company (the "Piggyback Registration") and to cause such Piggyback Registration to become and remain effective for a period of not less than 120 days thereafter (or until such time as all securities sold thereunder shall have been sold).

(ii)     If a Piggyback Registration is an underwritten primary registration on behalf of the Company, and the managing underwriter thereof advises the Company in writing (with a copy to the Seller) that in its opinion the number of securities requested to be included in such registration exceeds the number which can be sold in such offering, the Company will include in such registration: (A) first, the securities the Company proposes to sell; and (B) second, the securities any other security holder of the Company (including the Seller) proposes to sell in proportion to the number of securities each proposes to sell.

(iii)     If a Piggyback Registration is an underwritten secondary registration on behalf of the Company's security holders, and the managing underwriter thereof advises the Company in writing (with a copy to the Seller) that in its opinion the number of securities requested to be included in such registration exceeds the number which can be sold in such offering, the Company will include in such registration: (A) first, the securities the security holders of the Company which have exercised contractual demand registration rights in connection with such registration propose to sell, in proportion to the number of securities each proposes to sell; and (B) second, the securities any other security holder of the Company (including the Seller) proposes to sell in proportion to the number of securities each proposes to sell.

(b)     Indemnity. The Company will indemnify and hold harmless the Seller, the officers, directors, partners and employees of the Seller and each underwriter of securities sold by the Seller pursuant to Section 8(a)(i) (and any Person who controls the Seller or underwriter within the meaning of Section 15 of the Securities Act) against all claims, losses, damages, liabilities, actions and expenses resulting from any untrue statement or alleged untrue statement of a material fact contained in a prospectus or in any related registration statement, notification or the like or from any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been based on information furnished in writing to the Company by the Seller or such underwriter expressly for use therein and used in accordance with such writing. The Company agrees to reimburse each indemnified Person for any legal or any other expenses reasonably incurred in connection with investigating or defending any such loss, claim, damage, liability, action or expense. Such indemnity shall remain in full force and effect irrespective of any investigation by any Person indemnified above.

(c)     Expenses. The Company shall pay all expenses incurred by complying with Section 8(a)(i), including without limitation all registration and filing fees, printing expenses, fees and disbursements of counsel and independent public accountants for the Company, fees and expenses (including counsel fees) incurred in connection with complying with state securities or "Blue Sky" laws (other than those which by law must be paid by the selling security holders), fees of the National Association of Securities Dealers, Inc., transfer taxes, fees or transfer agents and registrars and stock exchange listing fees, but excluding all underwriting discounts and selling commissions applicable to the sale of Eligible Securities. All expenses of participating sellers other than those assumed by the Company in the Note attached hereto shall be borne by such sellers in proportion to the number of shares sold by each seller or as they may otherwise agree.

6

(d)     Registration Covenants of the Company.  In the event that any securities of the Company are to be registered pursuant to this Section 8, the Company covenants and agrees that the Company will use its best efforts to effect the registration and cooperate in the sale of the Eligible Securities to be registered and will take such other actions as shall be reasonably requested by the Seller in connection with the Piggyback Registration.

## SECTION 9. SURVIVAL OF REPRESENTATIONS AND WARRANTIES

9.01 Survival of Representations. Notwithstanding any investigation at any time made by or on behalf of any party hereto, all representations and warranties contained in this Agreement shall survive from and after the date hereof until one year after the date of this Agreement (the "Survival Date").

9.02 Indemnity by Parties. Each of the Buyer and the Seller agree to defend, indemnify and hold harmless the other party against any and all demands, claims, actions or causes of action, losses, liabilities, damages, assessments, deficiencies, taxes, costs and expenses, including without limitation, interest, penalties and reasonable attorneys' fees and expenses asserted against, imposed upon or paid, incurred or suffered by the other as a result of, arising from or in connection with (i) any breach or inaccuracy of any representation or warranty of such party in this Agreement or (ii) any breach of any of its covenant or agreement contained in this Agreement.

9.03 Successors. Notwithstanding anything to the contrary contained herein, the merger, consolidation, liquidation, dissolution or winding up of, or any similar transaction with respect to either party shall not affect in any manner the obligations of such party pursuant to this paragraph or any other term or provision of this Agreement, and each party covenants and agrees to make the adequate provision for its liabilities and obligations hereunder in the event of any such transaction.

## SECTION 10. MISCELLANEOUS PROVISIONS

10.01 Amendment and Modification. This Agreement may be amended, modified and supplemented by the Parties only by written instrument signed by or on behalf of the party to be charged thereunder.

10.02 Waiver of Compliance. Any failure of either of the Parties to comply with any obligation, covenant, agreement or condition herein may be expressly waived in writing by an authorized officer of the other party, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel, with respect to any subsequent or other failure.

10.03 Expenses. Each party shall be responsible for the payment of all of the expenses incurred by it in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including, but not limited to, any sales, use, income and transfer taxes incurred by such party in this transaction.

10.04 <u>Notices</u>. All notices, requests, demands, and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail, with postage prepaid as follows:

If to Buyer:          SLM Holding, Inc.
                      100 East Jefryn Blvd., Suite K,
                      Deer Park, NY     11729
                        Tel: (631) 393-0153
                        Fax: (631) 393-0159
                        Attention: Jason Bishara

With a Copy to: Gersten Savage, LLP
                      600 Lexington Avenue
                      New York, New York, 10022
                      Attention: Arthur S. Marcus, Esq.

or to such person or address as Buyer shall furnish to Seller in writing.

If to Seller:         VerticalFalls Software, Inc.
                      11921 Freedom Drive, Suite 550
                      Reston, Virginia 20190
                      Tel: (301) 502-0220
                      Fax: (301) 560-8821
                      Attention:  John Finkelstein, Neil Kleinberg

With a copy to:  10482 Armstrong Street
                      Fairfax, Virginia 22030
                      Attention: David W. Pijor, Esq.
                      Tel: (703) 385-8008
                      Fax: (703) 385-2896

or to such other person or address as Seller shall furnish to Buyer in writing.

10.05 <u>Binding Effect; Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective heirs, administrators, executors, legal representatives, successors and assigns; but, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party.

10.06 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principals of conflicts of law.

10.07 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

10.08 <u>Headings</u>. The headings of the sections and articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

10.09 <u>Entire Agreement.</u> This Agreement sets forth the entire agreement and understanding

of the Parties in respect of the subject matter contained herein, and supersedes all prior agreements, promises, letters of intent, covenants, arrangements, communications, representation or warranties, whether oral or written, by and party hereto or by any Related Person or by any Related Person of any party hereto. All Exhibits attached hereto and all documents and other instruments delivered or to be delivered pursuant to the terms hereof are hereby expressly made a part of this Agreement as fully as though set forth herein, and all references herein to the terms "this Agreement," "hereunder", "herein", "hereby" or "hereto" shall be deemed to refer to this Agreement and to all such writings.

10.10. <u>Third Parties.</u> Except as specifically set forth or referred to herein, nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon or give to any person, firm, partnership, corporation or other entity other than the Parties and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

10.11. <u>Severability.</u> The invalidity of anyone or more of the phrases, sentences, clauses, paragraphs or subparagraphs contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part hereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses, paragraphs or subparagraphs contained in this Agreement shall be construed as if such invalid phrase or phrases, sentence or sentences, clause or clauses, section or sections, paragraph or paragraphs, or subparagraph or subparagraphs had not been inserted.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first written.

SELLER:

VERTICALFALLS SOFTWARE, INC.

By: _____
    Jon Finkelstein, Chief Executive Officer

By: _____
    Neil Kleinberg, President

BUYER:

SLM HOLDINGS, INC

By: _____
    Jason Bishara, Executive Chairman

NATIONAL CAPITAL COMPANIES, LLC

By: _____
    Darren Womer, President (in relation to
    section 2.01 (iii))

**EXHIBIT A**

**Assets of VerticalFalls Software, Inc.**
**To Be Sold Pursuant To Asset Purchase Agreement**

Bank Accounts:


Software:

- All VerticalFalls-owned FAct and ACT!-related tools, utilities, and customizations
- VerticalFalls website and all related materials
- VerticalFalls portal and all related materials
- VerticalFalls marketing and sales tracking system
- The rights to use all FAct-related software owned by Sage as defined in the Sage FAct Asset Purchase Agreement


Copyrights and Trademarks:

All copyrights and trademarks relating to VerticalFalls Software, Inc.

Following contracts (4), subject to their terms:
- Sage FAct Asset Purchase Agreement
- Morgan Stanley IIG IT FAct Enterprise Task Order 2
- Morgan Stanley Charleston, West Virginia FAct Task Order Extension Lease
- Wachovia Securities Atlantic City, New Jersey Complex FAct Lease

Customer/Prospect Lists:

To be delivered upon execution of this agreement

**EXHIBIT B**

**Form of Assignment of Assets**

To be provided at closing

**EXHIBIT C**

Allocation of Consideration

| | |
|---|---|
| Contracts, Subject to Their Terms | $50,000 |
| Customer/Prospect Lists | $50,000 |
| Goodwill and Related Materials | $400,000 (Balance of Consideration) |

**Schedule 1.01**

**Royalties, Overrides and Fees**

Until such time as: (a) Jon Finkelstein's name and Neil Kleinberg's name are both removed from the VF Credit Line; (b) all their individual guarantees of such credit line are released; and (c) all VF Trade Debt has been satisfied in full, Buyer shall apply any and all royalties/earn-out payments payable by Sage under the Sage FAct Asset Purchase Agreement to the VF Credit Line first and the VF Trade Debt second (excluding the amounts due to NCC under 2.01 (iii) of this Agreement). Upon full satisfaction of the VF Trade Debt and the VF Credit Line, additional proceeds received from the Sage Fact Asset Purchase Agreement up to the amount of $100,000.00 shall be delivered and paid to the Seller by the Buyer. Specifically, any proceeds received from the Sage Fact Asset Purchase Agreement in excess of VF Trade Debt and the VF Credit Line amounts (as detailed in section 2.01 above) and up to $550,000 will be paid to Seller upon receipt by Buyer.

**Schedule 2.01**

**Trade Debt**

To be provided by Seller

# EXHIBIT B

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made between SLM Holdings, Inc., a Delaware corporation (the "Company"), and Jon Finkelstein ("Executive"), with address at 19998 Shadow Creek Ct, Ashburn, VA 20147;

## W I T N E S S E T H:

WHEREAS, the parties hereto have agreed to enter into this Employment Agreement pursuant to the terms and conditions of the Asset Purchase Agreement (the "Purchase Agreement"), dated August 10, 2007, by and between SLM Holdings, Inc., a Delaware corporation (the "Company"), and VerticalFalls, Inc., a Virginia corporation ("VerticalFalls");

WHEREAS, Jon Finkelstein (the "Executive") is the Chief Executive Officer of VerticalFalls;

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties, intending to be legally bound, agree as follows:

1.    Effective Date.  This Employment Agreement (the "Agreement") shall become effective as of the date of its execution (the "Effective Date") and shall terminate and be of no force or effect if the Agreement is terminated in accordance with its terms.

2.    Employment and Duties. Executive shall have such duties, functions, responsibilities, and authority customarily pertaining to the position of Interim Chief Operating Officer and member of the Board of Directors (the "Board"), subject, however, to the directives of the majority of Board. Executive shall devote his full time, skill, attention and his best efforts during normal business hours to the business and affairs of the Company, and in furtherance of the business and affairs of the Company and its subsidiaries; except for usual, ordinary, and customary periods of vacation and absence due to illness or other disability;

3.    Base Compensation.  The Company shall pay Executive for his services under this Agreement as follows:

(a)    A gross base annual salary equal to $200,000.00 for the duration of his employment (the "Base Salary") payable in accordance with the regular semi-monthly payroll schedule of Buyer. Any unpaid amount of the annual base salary shall accrue interest at the rate of 8% per annum, principle and interest to be payable upon the earlier of (i) after eight months from the execution of this Agreement; or (ii) at the time the Company obtains, after the execution of this Agreement, gross revenues from any sources in the amount of at least $1,000,000.00; or (iii) upon Buyer's receipt at any time after the execution of this Agreement of aggregate net proceeds from private or public offerings of its securities amounting to at least $5,000,000 cumulatively.

Notwithstanding anything to the contrary herein, Executive agrees that non-payment of the Executive's Base Salary for the first four months from the date of this agreement shall not constitute Good Reason for termination of this Agreement. Executive also agrees that (i) payment of at least $8500 per calendar month for each month from month four through month eight after the effective date of this agreement; or (ii) receipt by the Executive of at least $20,000 of his Base Salary then due and full payment of the bonus specified in Section 3 (b)(i) shall each operate to preclude the Executive from terminating this Agreement under Section 10 or any other applicable provision in this Agreement for a period of eight months from the date of this agreement.



(b)     Additional compensation to be payable as follows:

(i)     A bonus of $100,000 payable in the form of an eight month note. The note described in this paragraph shall be payable at a rate of $0.50 for every net dollar raised by the Company at any time after the execution of this Agreement. The note shall be payable in full upon the earlier of (i) after eight months from the execution of this Agreement; or (ii) at the time the Company obtains gross revenues from any sources in the amount of at least $1,000,000.00;

(ii)     An additional bonus of $100,000 if the Company obtains revenues in the amount of $2,500,000 within a period of 14 succeeding months after the execution of this Agreement; and

(iii)     An additional bonus of $100,000 if the Company obtains revenues in the amount of $5,000,000 within a period of 14 succeeding months after the execution of this Agreement;

(c)     In addition to the payments described in 3a and 3b above, the company agrees to reimburse Executive's costs for Medical insurance obtained up to a maximum amount of $1,000 per month.

Notwithstanding anything herein to the contrary, in the event that the Company pays its Chief Executive Officer, Jason Bishara, any amount as salary for services rendered by him after the execution of this Agreement, the Executive shall be entitled to receive an equivalent amount as payment of his Base Salary, which amount shall be deductible from the amount due on the Note.

4.     Vacations. Executive shall be entitled to take three weeks vacations, with pay, provided that such vacations do not interfere with the performance of his duties and services hereunder.

5.     Business Expenses. Executive shall be reimbursed by the Company for all expenses reasonably paid or incurred by him that is not in excess of $1,000 within a period of one (1) month, provided that such expenses are incurred in connection with the performance of his duties hereunder, and only upon approval obtained after presentation of expense statements, receipts or vouchers or such other supporting information reasonably evidencing such expenses.

6.     Term. The term of Executive's employment by the Company hereunder shall be for a period of three (3) years commencing on the Effective Date of this Agreement. The term of this Agreement may be extended upon mutual written consent of both parties to this Agreement.

7.     Termination. Executive's employment with the Company shall terminate upon the first to occur of the (i) expiration of the term of this Agreement (as may be extended pursuant to Section 6 hereof), (ii) death of Executive, (iii) disability of Executive, but only upon compliance with the provisions of Section 9 hereof, (iv) termination of Executive for Cause (as defined in Section 9), (v) termination by Executive pursuant to Section 11 hereof; or (vi) written consent of all parties to this Agreement.

8.     Disability of Executive. If, as a result of Executive's incapacity due to physical or mental illness, Executive shall have been absent from his duties hereunder on a full-time basis for the entire period of three consecutive months, and within thirty (30) days after written notice of termination is given (which may occur before or after the end of such three-month period) he shall not have returned to the

2

performance of his duties hereunder on a full-time basis (a "Disability"), employment of Executive hereunder shall cease.

9.    Termination for Cause.  The Company may terminate Executive's employment hereunder for Cause.  For purposes of this Agreement, the Company shall have "Cause" to terminate Executive's employment hereunder upon:

(a)    Discovery by the Company of any misrepresentation or false statements made by the Executive in the Asset Purchase Agreement entered into by and between the Company and VerticalFalls Software, Inc. dated August ___, 2007;

(b)    Executive's conviction of, or plea of nolo contendere to, any felony of theft, fraud, embezzlement or violent crime;

(c)    The willful and continued failure by Executive to substantially perform Executive's duties with the Company (other than such failure resulting from Executive's incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to Executive by the Board, which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties;

(d)    The willful engaging by Executive in misconduct which is materially injurious to the interests of the Company or any successor thereto (or any affiliate of the Company or a successor thereto);

(e)    The failure of the Company to earn revenues in the amount of $1,000,000 within the first 8 months of the effectivity of this Agreement; or

(f)    The failure of the Company to earn revenues in the amount of $3,000,000 within the first 14 months of the effectivity of this Agreement;

For purposes of this Section 10, no act, or failure to act, on Executive's part shall be considered "willful" unless done, or omitted to be done, by Executive not in good faith and without reasonable belief that Executive's action or omission was in the best interest of the Company.

Notwithstanding the foregoing, Executive shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to Executive a copy of a notice of termination from the Board, after (x) reasonable notice to Executive, (y) an opportunity for Executive, together with Executive's counsel (the reasonable fees of which shall be born by the Executive), to be heard before the Board, finding that, in the good faith opinion of the Board, Executive was guilty of conduct set forth above in clauses (a), (b) or (c) of the second sentence of this Section 9 and specifying the particulars thereof in detail, and (z) in the case of conduct set forth in clause (c), a period of not less than sixty (60) days to remedy same.

In the event of termination of the Executive for Cause, the Executive shall forfeit and immediately return all shares of common stock in the Company which he has received by virtue of his employment herein.

10.    Termination by Executive.  Executive may terminate his employment hereunder (i) for Good Reason, or (ii) for any other reason upon providing at least 90 days advance written notice.

For purposes of this Agreement, "Good Reason" shall mean any of the following:

3

(a)    A failure by the Company to comply with any material provision of this Agreement which has not been cured within sixty (60) working days after written notice of such noncompliance has been given by Executive to the Company;

(b)    A material change in the nature or scope of Executive's duties, as described herein, or as may be reasonably requested by the Board of Directors of the Company, from time to time, from those engaged in by Executive on and immediately after the date of this Agreement;

(c)    A reduction in Executive's annual Base Salary, other compensation or any other benefits from that provided to him pursuant to this Agreement, unless such reduction is with the express or implied consent of the Executive;

(d)    A material diminution in Executive's eligibility to participate in or in the benefits provided to Executive under any bonus, stock option or other incentive compensation plans or employee welfare and pension benefit plans (including medical, dental, life insurance, retirement and long-term disability plans) from that provided to him on the date of this Agreement;

11.    Notice of Termination.  Any termination of Executive's employment by the Company pursuant to Sections 7, 8 or 9 shall be communicated by 120 day prior written Notice of Termination to the Executive. For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provisions in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed or provide a basis for termination of Executive's employment under the provision so indicated.

12.    Effect of Termination of Employment for Cause    If the Company shall terminate Executive's employment for Cause, then upon such termination, all rights, benefits and compensation of Executive under this Agreement shall immediately terminate, except that equity options, if any, shall continue to be governed in accordance with their terms. The rights and remedies of the Company as set forth in this Section 12 shall be cumulative with and shall be in addition to (i) any and all other relief available to the Company for breach by Executive of any other provision of this Agreement, and (ii) any and all other general or equitable relief to which the Company may be entitled by reason of such breach.

13.    Other Termination of Employment.  If Executive shall terminate his employment for Good Reason under Section 11 hereof, then (i) within 30 days following such termination, upon Executive's execution of the General Release, the Company shall pay to Executive an amount equal to three (3) times the sum of (A) the amount of Executive's monthly base salary; (ii) Executive shall be entitled to continue to participate in all benefit programs and incentive plans of the Company during a period equal to the remainder of Executive's employment term hereunder, but in no event shall such period be more than twelve (12) months.

14.    Legal Fees.  Each Party shall pay all reasonable legal fees and expenses promptly as they are incurred by the other party in seeking to obtain or enforce any right or benefit provided under this Agreement.

15.    Confidentiality; Non-Compete.  During the time of Executive's employment and for a period of two (2) years following the termination of Executive's employment with the Company, Executive agrees not to compete with the Company for any acquisition, prospect or project that the Company was pursuing, or has expressed its intention to pursue prior to Executive's termination, and Executive shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for his own personal benefit or for the benefit of anyone else, any trade secrets, confidential

4

dealings, or other confidential or proprietary information of any kind, nature, or description (whether or not acquired, learned, obtained, or developed by Executive alone or in conjunction with others) belonging to or concerning the Company or any of its subsidiaries, except (i) with the prior written consent of the Company duly authorized by its Board of Directors, (ii) in the course of the proper performance of Executive's duties hereunder, (iii) for information (x) that becomes generally available to the public other than as a result of unauthorized disclosure by Executive or his affiliates or (y) that becomes available to Executive on a nonconfidential basis from a source other than the Company or its subsidiaries who is not bound by a duty of confidentiality, or other contractual, legal, or fiduciary obligation, to the Company, or (iv) as required by applicable law or legal process.

16.   Miscellaneous.   (a)   Notices.   Any notice or communication required or permitted hereunder shall be given in writing and shall be (i) sent by first class registered or certified United States mail, postage prepaid, (ii) sent by overnight or express mail or expedited delivery service, (iii) delivered by hand or (iv) transmitted by facsimile transmission, to the address or fax number for the party as set forth opposite such party's name on the signature page hereof, or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable party in accordance herewith.  Any such notice or communication shall be deemed to have been given as of the date of first attempted delivery at the address or fax number and in the manner provided above.

(b)   Successors and Assigns.   This Agreement is personal in nature and neither of the parties hereto shall, without the consent of the other, assign or transfer this Agreement or any rights or obligations hereunder; provided, however, that in the event of a merger, consolidation or transfer or sale of all or substantially all of the assets of the Company, this Agreement shall be binding upon the successor to the Company's business and assets.

(c)   Interpretation.   When the context in which words are used in this Agreement indicates that such is the intent, words in the singular number shall include the plural and vice versa, and the words in masculine gender shall include the feminine gender and vice versa.

(d)   Severability.   Every provision in this Agreement is intended to be severable.  In the event that any provision of this Agreement shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remaining provisions of this Agreement.

(e)   Captions.   Any section or paragraph titles or captions contained in this Agreement are for convenience only and shall not be deemed a part of the context of this Agreement.

(f)   Entire Agreement.   This Agreement together with the Purchase Agreement contains the entire understanding and agreement between the parties and supersedes any prior written or oral agreements between them respecting the subject matter contained herein.   There are no representations, agreements, arrangements or understandings, oral or written, between and among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein or therein.

(g)   No Waiver.   Except as provided under this Agreement, the failure of any party to insist upon strict performance of a covenant or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such party's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any obligation hereunder.

(h)     <u>Amendment</u>.  This Agreement may be changed, modified or amended only by an instrument in writing duly executed by all of the parties hereto.  Any such amendment shall be effective as of such date as may be determined by the parties hereto.

(i)     <u>Enforcement</u>.     The Company may enforce this Agreement pursuant to the provisions of the Purchase Agreement.

(j)     <u>Choice of Law</u>.  This agreement and the rights and obligations of the parties hereunder shall be governed by the laws of New York.

IN WITNESS WHEREOF, the parties have executed this Agreement or caused the same to be executed by their duly authorized corporate officers, all as of the day and year first above written.

"Executive"

_____
Jon Finkelstein
Address:
Fax No.

"Company"                               SLM HOLDINGS, INC

By: _____
    Jason Bishara
    Executive Officer
Address:
Fax No.

6